MAJOR, The LIZZIE. See Case No. 8,422.

MAKEEVER (BARTH v.). See Case No. 1,-069.

MAKINS (U. S. v.). See Case No. 15,710.

---

## Case No. 8,985.

### The MALAGA.

LOVETT et al. v. BISPHAM.

[2 Amer. Law J. (U. S.) 97; 4 Pa. Law J. Rep. 339.]

District Court, E. D. Pennsylvania. 1849.

ADMIRALTY — LIBEL FOR DAMAGES — UNLAWFUL SEIZURE—PROBABLE CAUSE—DEFENCE—RESTITUTION AND ACCEPTANCE.

1. The ordinary practice of the admiralty court is to entertain the question of damages as well as costs at the same time with the principal question of the legality of the arrest; revenue laws form an exception, however.

2. A certificate of probable cause cannot be granted where there has been neither claim nor trial, nor decree, nor anything to which an appeal could lie, because there is nothing to inform the conscience of the judge as to the propriety of giving or withholding the certificate.

3. Probable cause defined and explained. If there is reasonable ground for a seizure, and this is a question of fact, it is a defence to a libel for damages.

4. An act of restitution and acceptance, as was the case here, is a mutual release, and bars the libelants' claim, had it been never so meritorious.

[This was a libel by Charles J. Lovett, Josiah Lovett, Jr., Elliott Woodbury, and

Seward Lee, captain and owners of the brig Malaga, against John E. Bispham, commander of the United States brig Boxer, to recover damages for an alleged unlawful detention of libellants' brig.]

J. Williams Biddle and Mr. Williams, for libellants.

Mr. Hazelhurst and Mr. Pettit, for respondents.

KANE, District Judge. By the act of congress of March 3, 1819 (3 Stat. 532), the president of the United States is authorized, whenever he shall deem it expedient, to cause any of the armed vessels of the United States to cruise on the coast of Africa and elsewhere, with orders to seize, take, and bring into port all American ships which have taken on board, or which may be intended for the purpose of taking on board, slaves, in violation of the acts of congress prohibiting the slave trade; and by the same act it is made the duty of the commanders of public ships so employed, whenever they shall have "made any capture" of an American vessel contravening those acts, to bring her for adjudication into the state to which the "vessel so captured" belongs. Among the acts thus referred to are that of March 22, 1794 (1 Stat. 347), which denounces the penalty of forfeiture against every ship or vessel sailing from any port of the United States for the purpose of carrying on any trade or traffic in slaves, or of procuring slaves to be transported to any foreign country; that of May 10, 1800 (2 Stat. 70), which subjects to forfeiture the interest of every citizen or resident of the United States in any vessel employed or made use of "in the transportation of slaves from one foreign country to another;" that of April 21, 1818 (3 Stat. 450), the second section of which is almost identical with the provision I have referred to in the act of 1794; and that of May 15, 1840 (3 Stat. 600), which denounces as piracy the crime of seizing a free negro in any foreign country, or decoying, bringing, carrying, or receiving him on board a ship, with intent to make him a slave, or to confine or detain him on board with such intent, or to offer or attempt to sell him as such, or land him with intent to make such a sale, or after such a sale has been made. These acts were followed by the treaty of Washington August, 1842; (8 Stat. 576), by which it was stipulated between the United States and Great Britain "that each nation should prepare, equip, and maintain in service on the coast of Africa a suitable and adequate squadron or naval force, to carry in all not less than eighty guns, to enforce separately and respectively the laws, rights and obligations of each of the two countries for the suppression of the slave trade."

In accordance with the first cited of these acts of congress, and in compliance with the treaty stipulation, the president of the United States, on the 20th December, 1844, ordered Commodore Skinner to proceed with a squadron to the coast of Africa, to cruise there for the suppression of this traffic. In the instructions of the secretary of the navy to this officer, he was told: "The cunning of the slave trader is constantly framing new disguises to elude detection and escape the consequences of his crime. To some of these devices it may be useful to call your attention. It is not to be supposed that the vessels destined for the slave trade will exhibit any of the usual arrangements for that traffic. They take especial care to put on the appearance of honest traders, and to be always prepared as if in pursuit of lawful commerce. It is their practice to run into some river or inlet, where they have reason to believe that slaves may be obtained, make their bargain with the slave factor, deposit their handcuffs and other things calculated to betray them, and then sail on an ostensible trading voyage to some neighboring port. At the appointed time they return, and, as the slaves are then ready to be shipped, they are taken on board without delay, and the vessel proceeds on her voyage. Thus the slavers do not carry within themselves any positive proof of their guilt, except before they reach the coast, and after they leave it with the slaves on board. Nevertheless, there is a variety of signs and indications by which their true character may at all times be conjectured." The secretary then points out some of the marks by which a slaver may be recognized, and some of the artifices by which he generally seeks to mask his character. He adds: "These are a few only of the devices to which the slave trader resorts. In calling your attention to them, I have only in view to impress you with a deep sense of the artful character of the adversaries with whom you will have to deal, and of their reckless disregard of all truth and honor, as well as of law and humanity. Nothing but the utmost vigilance and caution will enable you to detect them. I have no doubt that your own observation and sagacity will soon discover other contrivances for deceiving and escaping you, and I have as little doubt that you will apply promptly and effectually the requisite means of defeating all such attempts."

Lieut. Bispham commanded the brig Boxer, one of the squadron under Commodore Skinner, and was directed to cruise in the vicinity of Kabenda, "where," said his orders, "our flag, it is believed, is frequently employed to cover the designs of slavers." Immediately on his arrival off that port, and before anchoring, Lieut. Bispham was informed by the commander of a British frigate that an American vessel was lying in Kabenda Bay, under suspicious circumstances, and on the following day, the 13th April, 1846, he directed her to be boarded in consequence. On producing her papers at the call of the boarding officers, she proved to be the American brig Malaga, of Beverly, Massachusetts, with

a cargo of farina, rice, rum, gunpowder, &c., from Rio Janeiro bound to Kabenda and St. Thomas, and back to Rio. Her consignee at Kabenda was a noted slave factor, named Da Cuntra; the port was one devoted exclusively to the slave trade and its tributaries; and the cargo was entirely suited to the exigencies of that traffic. A part of her cargo and a number of her passengers (foreigners) had been already landed. Lieut. Bispham, having seized her, called for her charter party; and this, being then presented for the first time, showed that she was under charter to Manuel Pinto de Fonseca, whose name, as the great employer of American vessels in the Brazilian slave trade, is familiar to our political and judicial records. The charter party itself was similar in all respects to that which is ordinarily used to cover these frauds upon our flag; it left the port or ports of destination to be indicated by the charterer's agents; it stipulated for the conveyance of passengers, not negroes; and the rate of charter (1800 milreas, about 1400 dollars a month, paid for the first month in advance, the vessel being of less than 184 tons) implied that the voyage was one of peculiar hazards. The vessel, moreover, when leaving the United States for Rio, had laid in a stock of provisions for a year; her crew had been shipped for 18 months, the voyages beyond Rio to be such as the captain might direct, among which the deposition of one of the crew shows that a voyage to the coast of Africa, though not named, was understood to be included. In addition to all this, the answer, which is not contradicted under oath (as it should have been, unless the facts set forth in it are to be regarded as admitted), avers that in conversations of the captain with the captors "it was not alleged by him that it was his intention to barter her coast goods on shore, or to carry back a return cargo to Rio de Janeiro; but he admitted that the cargo on board was to be exchanged for slaves, and used in that traffic." And this is confirmed by the testimony of Purser Hartwell: "I remarked to Captain Lovett, 'You must know the character of the cargo was such as is generally used on the coast in the slave trade;' and his reply in substance was, that he was not bound to know anything about it, and if that was the only business carried on at Kabenda, it was not necessary for him to be acquainted with it, nor for what purposes his cargo was to be applied."

The Malaga, having arrived in the United States in charge of a prize crew, was libelled by the district attorney of the United States for the district of Massachusetts on the 16th of June, 1846. The libel was of two counts, the first charging that, being the property of American citizens, she was employed in transporting slaves from one foreign country to another; the second, that she was fitted out, &c., and caused to sail from the United States, for the purpose of procuring negroes to be transported from Africa to some port

or place, for the purpose of their being sold as slaves; the first count being founded apparently on the act of congress of 1800, and the second on those of 1794 and 1818 (supra). The process was returned on the 3d of July, and appearance was noted on the docket by a proctor of the court, a stipulation was entered into for costs preliminary to a claim by the owners, and depositions were taken before a commissioner, the proctor for the claimants or owners attending him. Subsequently, on motion of the district attorney, it was ordered by the court that "said libel be discontinued, and said brig Malaga be delivered to Charles J. Lovett, captain thereof;" and a warrant of delivery, having issued, was returned by the marshal on the 17th July, that he had "caused to be delivered to C. J. Lovett, and had taken his receipt therefor," which is verified by the receipt itself: "July 17, 1846, received from the U. S. Marshal, in and for the district of Mass., the within named brig Malaga and appurtenances, in the same state as when seized and detained by him. Charles J. Lovett, Master Brig Malaga." No formal claim was ever made of record, and no answer was filed. In June, 1847, Lieut. Bispham returned from the coast invalided; and the 17th July succeeding this proceeding was instituted against him by a monition issued at the instance of the owners and captain of the Malaga. The libel asks damages for the unlawful detention of the vessel, for the use of her stores while under detention, certain injuries done to her sails, rigging, and other appurtenances, and the personal duress of the captain. The answer refers to the instructions of Lieut. Bispham from his commanding officer, admits the seizure and detention of the vessel and the use of the stores by the prize crew, but denies that the vessel or her appurtenances sustained damage, and alleges that the seizure was made in consequence of a reasonable suspicion that the vessel had violated the laws against the slave trade, the grounds of which suspicion it sets forth.

The proofs in the case are few and by no means full. From the libellant in this court I have the register, the charter party, the record of the proceedings in the district court of Massachusetts, the deposition of the mate, taken in February last under a rule of court, and two brief depositions, or, as I would rather term them, affidavits, from seamen, made under the act of congress, without cross-examination or notice. There are wanting the bills of lading, the passenger list, the crew roll, the consular certificate, and, generally, the papers with which the vessel sailed from Rio for the coast. The respondent has presented only the depositions of three officers of the Boxer, taken before a commissioner more than two years after the transaction. According to the view of the libellants, however, much even of the proof that is before me might have been

spared. They contend that the inquiry cannot now be entertained, whether there was reasonable ground for the arrest, or not, inasmuch as the district court of Massachusetts has ordered restitution, without granting a certificate of probable cause. If this be so, the function of this court expends itself in the simple duty of auditing the amount of the libellants' damages. The question, therefore, must be disposed of at the threshold.

In the first place, then, I remark, that, except in cases under the revenue and navigation acts, I have not found either in the English books, or our own, that the certificate of probable cause has ever been given or asked for in the admiralty. By the ordinary practice in instance, as well as prize, causes, the court entertains the question of damages, as well as costs, at the same time with the principal question of the legality of the arrest. The process issues in rem; the claimant comes in, asserts his right, and asks damages, if he deems himself entitled to them; and the court then, upon a full view of the ground, the cause, and the circumstances of the seizure, determines between the parties, each being for the time the actor.

Cases under the revenue laws form the exception in both countries,—in England by force of several statutes, 4 Geo. III. c. 15, p. 46, among the rest; and in the United States, by the provisions of the acts of congress of March 2, 1799 [1 Stat. 696], and February 24, 1807 [2 Stat. 422]. Nothing therefore is to be inferred against the respondent from the absence of such a certificate in the proceedings before the district court of Boston. But were this otherwise, I cannot, upon inspecting the record of that proceeding, perceive that the question of a certificate was, or could have been, brought before that honorable court. There was, in fact, no hearing of the cause, and there could have been nothing, therefore, to inform the conscience of the judge, as to the propriety of giving or withholding the certificate. According to the acts of congress, both of 1799 (1 Stat. 696) and 1807 (2 Stat. 422), there must have been a claim, a trial, and a decree for the claimants, to authorize the making of the certificate. The question whether it shall be given or not arises out of the decree of acquittal; and it is decided by the judge who tried the cause, on the evidence which was before him on the trial. Further evidence is not admitted. Stew. 112. An appeal from the decree carries with it the application for the certificate. Canter v. American Ins. Co., 3 Pet. [28 U. S.] 307, and the other cases. And if on the appeal, the question of forfeiture is decided against the claimant, there is an end to all controversy about probable cause. The officer cannot be held liable for a seizure as tortious after its propriety has been established by a final decree condemning the property. But here there was neither claim, nor trial, nor decree,—nothing to which an appeal could lie. It is a simple discontinuance, which, considered as an act in the cause, terminated it, but did not preclude the institution of new proceedings by the same captors and for the same cause. How can it be said that the captor is estopped by his discontinuance from alleging that he had probable cause for the seizure when that discontinuance left him at full liberty to reassert his title under the forfeiture, and to renew the seizure, if need be, for the purpose of enforcing it.

But it was argued that, independent of these acts of congress, the officer who has made a tortious seizure, has no escape from a decree of compensatory damages. But I need scarcely say that this has never been the law of the admiralty, either in instance or prize cases. The books are full of cases in which the arrest on the high seas has been held unlawful, but the court has refused to allow the claimant his damages or even his costs. I may refer to The Louis, 2 Dod. 210; Shattuck v. Maley [Case No. 12,-714], and The Marianna Flora, 11 Wheat. [24 U. S.] 1, as among the marked cases in which this course of adjudication has been pursued. "The common-law doctrine," says Judge Washington in Shattuck v. Maley [supra], "as to torts committed by officers acting under authority of law, is certainly very rigid. They act at their peril; and if they by mistake act wrong, there are but few cases in which they can be excused. But a reason may exist for this severity in cases happening on land, which does not exist where similar cases occur at sea. In the former, the means of obtaining correct information are more within the power of the officer; and the officer may, in most cases, if he doubts as to the fact, insist upon being indemnified by the party. But at sea this cannot be done." "To hold the officer," he adds, "responsible according to the event would be to render the law nugatory, since few men would be found bold enough to ensure the eventual solidity of their judgment, however strong they might suppose the ground of it to be. But to excuse the officer from damages if he should, in the execution of this limited authority, violate the rights of others, he must show such reasons as were sufficient to warrant a prudent, intelligent, and cautious man in drawing the same conclusion. This is what is called probable cause."

"It is a different thing" said Judge Story, delivering the opinion of the supreme court in The Marianna Flora [supra], "to sit in judgment on this case, after full legal investigations, aided by the regular evidence of all parties, and to draw conclusions at sea, with very imperfect means of ascertaining facts and principles, which ought to direct the judgment. It would be a harsh judgment to declare that an officer, charged with high

and responsible duties on the part of his government, should exercise the discretion entrusted to him at the peril of damages, because a court of law might ultimately decide that he might well have exercised that discretion another way. Even in maritime torts, independent of prize, courts of admiralty," he added, "are in the habit of giving or withholding damages upon enlarged principles of justice and equity, and have not circumscribed themselves within the positive boundaries of municipal law. They have exercised a conscientious discretion on the subject."

I am, therefore, not precluded by the action in the district court of Massachusetts from entertaining the question whether there was reasonable ground for the seizure of the Malaga, and if there was such reasonable ground, it is a defence to the present libel. In discussing this question, which is altogether one of fact, I feel very sensibly the imperfection of the proofs before me. I should be well pleased to examine the bills of lading, and shipping roll, appertaining to the voyage from Beverly to Rio, and the letters of instructions under which the captain felt himself authorized to charter her to Fonseca. I need, too, the manifest, the log book, the list of passengers from Rio to the coast, the crew list, the bills of lading, and all the other papers which were or should have been on board of her when she was arrested. These, if produced, might go to relieve my mind of the dark suspicions which now press upon it. If they were ever in the possession of the captors, they were restored with the vessel, and the libellants should have produced them here. In their absence, I can only say that I am by no means satisfied of the innocence of this vessel, and that I think her owners may be well content with her release without asking more. Among the circumstances already adverted to in the narrative part of this opinion, there is one, which standing by itself unexplained, would go far to justify the arrest of the Malaga. According to the mate, "she had on board some three or four hundred bags of farina and rice." The former of these articles is a coarse flour, used almost exclusively for the diet of slaves on the passage to Brazil. It is the cheapest substitute for the African cassada, which is the food of the natives along the coast, and resembles it much. By the British act for the suppression of the slave trade (2 and 3 Vict. c. 73, § 4), it is expressly provided, that "an extraordinary quantity of rice, or of the flour of Brazil, commonly called farina, beyond what might probably be requisite for the use of the crew, found on board of a vessel, and not entered on the manifest as part of the cargo for trade, shall be considered as prima facie evidence of the actual employment of the vessel in the transportation of negroes for the purpose of consigning them to slavery," and as such, shall render her liable to condemnation. The three or four hundred bags of rice and farina, which were on board of the Malaga, were

obviously not for the use of the crew, since the vessel was otherwise provisioned fully. If they were entered upon the manifest, the presumption which they raise would be rebutted; but the manifest, as I have already said, is not produced. It would be a severe judgment against an American officer, charged to give effect to the treaty stipulations between his country and Great Britain, to hold that circumstance inadequate as a ground of reasonable suspicion, which in an English court would condemn the ship.

But, independent of this fact, the whole case is pregnant with suspicion. There is scarcely a circumstance wanting, except the final consummation of a guilty purpose, to place it at the side of the Pons [case unreported], whose fate is upon the records of this court, and her associates, the Enterprise and the Kentucky [unreported], as they stand out in the documents of Mr. Wise, that accompanied the president's message of the 3d of March last,—the same charter party, scarcely varied, and the same Messrs. De Fonseca, and Da Cunha figuring as principal and subordinate. Whether she was intended to be used in the actual transport of slaves, or to serve as the tender and accomplice of the slave ship, carrying out the foreign crews, which were to navigate to Rio under the Brazilian flag, and bringing back the American, which had navigated from Rio under that of the United States; whether she merely carried to the coast the goods which were to purchase slaves, and the farina which was to feed them, or whether, after landing part of her supplies at Kabenda, she was, in the words of the secretary of the navy, to "sail on an ostensible trading voyage to some neighboring port, returning when the slaves were ready to be shipped,—and then taking them on board without delay," I need not form an opinion. Nor need I inquire, in the absence of all the appropriate proofs, whether the sailing from Beverly for Rio was altogether free from dishonoring circumstances. It is enough for me to be convinced,—and of that I am convinced most fully,—that Lieut. Bispham acted with intelligent and honorable discretion in arresting the Malaga, and sending her to this country for adjudication. It is wholly immaterial for this defence whether all, or how many, of these circumstances of suspicion were present to his mind at the time of the arrest. If the vessel was guilty, he is excused for bringing her in, even if he mistook her crime. I adopt the language of Judge Story on this point, (La Jeune Eugenie.) [Case No. 15,551]: "In truth, the law looks not to niceties of this sort. If for any cause, precedent or subsequent, known at the beginning or known at the end, the property is condemned, the party is justified; and retroactively, for all purposes, the capture, or seizure, or forcible possession, call it what you may, is deemed rightful and bona fide."

I have thus far followed the learned counsel, in the arguments they have presented to

me, and should be excused perhaps for dismissing the cause without further remark. But there is one view of the closing act in the proceedings, at Boston, which I cannot pass over. That act, it seems to me, was an act of restitution and acceptance, unqualified, unconditional, without reserve or protest on either side. The action of the court was invoked only because the property had passed into its custody, and could not be released except by judicial order. The act was the act of parties, solemnized by record. Such an act of restitution and acceptance is a mutual release, and bars the libellant's claim, had it been never so meritorious.

A case, closely analogous to the present, came before Sir William Scott, in the Maria Powlona, (6 C. Rob. Adm. 236.) The vessel had been captured, and was restored before final adjudication. The owners afterwards presented a demand in the admiralty against the captors, for damages, and they urged that the captain's acceptance of the property was not intended as a waiver of damages,—that it had no other object than to expedite justice, and that it had, moreover, occurred without any consultation with his principals, the owners, and without any opportunity for such consultation. Sir William Scott said: "On the papers being brought in, a proposal was made to the master that he might proceed on his voyage, and it must be understood to have been an absolute and unqualified proposal, and meant as a general acquittal on both sides." If there had been an intention to prosecute a demand for damages, arising from the seizure, the offer should have been accepted sub modo. Instead of that, the restitution was accepted in the manner in which it was proposed, and, as such, must be understood to include an act of amnesty on both sides. It is not for the parties, then, to come again before the court, after all the papers have been withdrawn, and charge the captors with an unjustifiable seizure, when they have, in consequence of the restitution, lost the opportunity of defending themselves. The claimant must take the inconvenience with the convenience of restitution. I am of opinion that the claimant has put himself out of the court, and that the offer of restitution being accepted as it has been, must be considered as a discharge. I need not advert again to the circumstances in the case before me, which give emphasis to Sir William Scott's argument. The libel must be dismissed, with full costs.